In re **ALASKA LABOR TRADES ASS'N, Inc.**
**No. 909.**

District Court of Alaska. Third Division. Anchorage.
Feb. 5, 1945.

George B. Grigsby, Karl Drager, and J. Gerald Williams, all of Anchorage, Alaska, for applicant.

Noel K. Wennblom, U. S. Atty., of Anchorage, Alaska, for protestor.

DIMOND, Judge.

This is a hearing on an application for a liquor license by the Alaska Labor Trades Association (Inc.) a non-profit corporation organized under the laws of Alaska, commonly known, from the initials of its name, as the Alta Club. It will be hereinafter referred to as "the club." The premises occupied by the club are located at 435 Fifth Street in the City of Anchorage, Alaska. The owner of the premises is another but the club occupies through Z. E. Eagleston, a resident of Anchorage who holds a lease on the premises entered into on April 1, 1944 by E. R. Tarwater, the then owner, now deceased, for a term to expire on July 31, 1948, at rental of $75 per month and containing provision forbidding assignment of the lease or underletting without the written consent of the lessor or his attorney.

Upon the filing of the application it was referred, under Territorial law, to the City Council of the City of Anchorage. On January 18 there was filed in the office of the clerk of the court the certificate of the acting city clerk to the effect that the application had been presented to and was approved by the city council at a regular meeting held on January 17, 1945. On January 20, 1945, Noel K. Wennblom, United States Attorney for the Third Division, Territory of Alaska, filed herein a protest against the issuance of a license to the applicant upon the grounds: (1) that a person other than the applicant had and has a financial interest in the business for which the license is sought; (2) that during the year 1944 while the premises were used

under the same type of license, such premises were not always made easily accessible for inspection by municipal officers and that such officers were by actual force prevented from making an inspection of said premises while the premises were under the same management as at the present time; and (3) that during the year 1944 said premises and business were frequently operated in violation of municipal ordinances of the City of Anchorage governing the hours of operation of liquor selling establishments. Mr. Wennblom is not here an interloper, for the applicable law hereinafter quoted places upon him responsibility as to its enforcement.

The applicant objected to the sufficiency of the protest but the objections were overruled by the court and the application set down for hearing. At the hearing oral testimony was taken and a number of exhibits were offered and received in evidence.

The application is made under an act of the Alaska Territorial Legislature, largely embraced in Chapter 78 of the Session Laws of Alaska 1937 as amended. The relevant provisions of the act and other laws having relation to the question involved, follow:

"Section 1. That no person, firm, corporation or company shall manufacture, sell, offer for sale or keep for sale, traffic in, barter or exchange for goods in this Territory, any intoxicating liquor except as hereinafter provided; but this shall not apply to sales made by a person under provisions of law requiring him to sell personal property. Whenever the term 'intoxicating liquor' is used in this Act it shall be deemed to include whiskey, brandy, rum, gin, wine, ale, porter, beer, hoochinoo and all spirituous, vinous, malt and other fermented or distilled liquors.

"Section 2. That the licenses provided for in this Act shall be issued by the Clerk of the District Court or any subdivision thereof in compliance with the order of the Court or Judge thereof duly made and entered; and the Clerk of the Court shall keep a full record of all applica-

tions for licenses and of all recommendations for and remonstrances against the granting of licenses and of the action of the Court thereon.

"Section 3. That before any license is granted, as provided in this Act, it shall be shown to the satisfaction of the Court that a majority of the citizens over the age of twenty-one years, residing within two miles of the place where intoxicating liquor is to be manufactured, bartered, sold and exchanged, or bartered, sold or exchanged, have in good faith consented to the manufacture, barter, sale and exchange, or the barter, sale and exchange of the same; and the burden shall be upon the applicant or applicants to show to the satisfaction of the Court that a majority of the citizens over twenty-one years of age have consented thereto and no license shall be granted in the absence of such evidence; provided, that when it is made to appear that a majority of said citizens over the age of twenty-one years of any one place have consented to the manufacture, barter, sale and exchange or the barter, sale and exchange of intoxicating liquor, no further proof of the consent of the citizens of the place where such intoxicating liquor is to be manufactured, bartered, sold and exchanged, or bartered, sold and exchanged, will be required for twelve months thereafter.

"Provided, however, that any application for a license coming from within an incorporated town shall have attached thereto in lieu of a majority of the citizens of that district, a list of at least five references as to the integrity of the applicant and the desirability of the issuing of a license for the premises mentioned therein. The Clerk of the Court, upon receipt of each application from within an incorporated town, shall notify the city council of that town of the necessity for action on the application by the council, in regular or special meeting and the filing with the Clerk of the Court of a certificate showing the action taken. A failure of the municipal officers to act upon applications for licenses within the period specified in the notice furnished them shall be considered a default and shall subject

the city to the penalty of losing its right to a refund as herein provided. At the time set for the hearing, the Court shall consider the application and any protests that may be filed against the same, and shall also hear the applicant or others appearing in connection with the matter, and give its judgment, which shall be final. If the application is rejected the fee accompanying the same shall be returned. The licensee shall cause the license to be posted in a conspicuous position in his place of business, so that anyone entering the premises may easily read it. No license issued under the provisions of this Act shall be transferred except after first securing the consent of the Court. No refund of license fees will be allowed after the issuance of license.

"Section 4. Applications. All applicants for licenses mentioned herein shall file with the Clerk of the District Court an application in writing, signed and sworn to by the applicant, giving his name and address, and, if a corporation, executed by the duly authorized officers thereof, containing the following:

"(1) Kind of license desired:

"(2) A description of the place for which the license is desired, giving address by street and number, or other information, so that the location can be definitely determined;

"(3) A statement of the citizenship or corporate qualifications of the applicant;

"(4) The necessary license fee;

"(5) Together with the consent of a majority of citizens over the age of twenty-one years, residing within two miles of the place where the intoxicating liquor or liquors are to be manufactured, bartered, sold and exchanged, or bartered, sold and exchanged. That if any false material statement is made in any part of such application the applicant or applicants shall be deemed guilty of perjury and upon conviction thereof shall be subject to the penalty provided by law for the crime of perjury.

"That should it appear to the District Court that any of the statements above enumerated and required in the application are untrue at the time of application for such license, such application shall be denied.

"That should it appear to the District Court after the granting of such license that any of the statements above enumerated and required to be made in the application are untrue, it shall be the duty of the Court to forthwith enter an order revoking such license and all license moneys deposited by the applicant shall be thereby forfeited to the Territory, and it shall be the duty of the United States Marshals and their deputies, and United States Attorneys and their assistants, and all chiefs of police and other peace officers in their respective Divisions, Districts, Towns or settlements to investigate and report to the District Court any violation of any of the provisions of this Act.

"Section 5.

"(1) It shall be unlawful to give, barter or sell any intoxicating liquors, including beer and wine, to any person under the age of twenty-one years, to any intoxicated person, or to any habitual drunkard; and it shall be unlawful for any licensee to permit the giving, selling, bartering or drinking of any intoxicating liquor within the premises covered by any license to or by any of the forbidden classes, nor shall such licensee permit the drinking of hard or distilled liquors by any person upon the premises covered by his license, unless the same is permitted under the classification of his license.

"The drinking of intoxicating liquors on the premises covered by any license by any of the forbidden classes, or the presence of any intoxicated person on such premises, shall be cause for revocation of any such license, and further that any person attending any grade or high school shall be considered less than twenty-one years of age, and the burden of determining the age shall be on the licensee.

"It shall be unlawful to give, barter, sell, or in any way dispose of any intoxicating liquor, including beer and wine,

upon any day which any general, special, or Primary Election is held in the Territory or in any Municipality or other Political Subdivision thereof until the polls have been closed on such day.

"(2) It shall be unlawful to permit any person under the age of twenty-one years to enter any Beverage Dispensary unless the said minor is accompanied by his parent or guardian.

"(3) No license shall be issued for the sale of any intoxicating liquor in any building within two hundred feet of any school building or church. Provided, however, that a license may be reissued for the sale of intoxicating liquor in any building in which the sale of intoxicating liquor was at the time of the passing of this Act, authorized by law.

"(4) The premises of licensees under this Act shall be easily accessible for inspection by municipal officers, United State Attorneys, Assistant United States Attorneys, United States Marshals, Deputy Marshals and Clerks of the District Court, and all other officers charged with the enforcement of the provisions of this Act, during all regular hours of the transaction of business upon said premises. For the purpose of this Act, the premises covered by any license issued hereunder, shall be held to include all rooms in any building which can be reached without leaving the building.

"(5) It shall be unlawful for the holder of any Wholesaler's, Brewer's, Distiller's, or Bottler's License to carry for sale any stock of intoxicating liquors in the Territory except on the premises licensed, and it shall be unlawful for any of the four above-mentioned classes to sell any such intoxicating liquors from any boat or other carrier.

"(6) No person, firm or corporation shall manufacture, barter, sell or possess for sale, any intoxicating liquor in the Territory of Alaska without having procured an appropriate license. All licensees under the provisions of this Act selling to the general public shall be charged with the knowledge that the wholesaler, distiller, importer, brewer or bottler from whom they purchased intoxicating liquors is properly licensed to sell the same.

"(7) Any intoxicating liquors shipped into the Territory of Alaska other than to licensees hereunder shall be deemed contraband and subject to confiscation by the Territory and any intoxicating liquors so seized shall be sold under the orders of the District Court and the proceeds thereof deposited with the Territorial Treasurer; provided, however, that the provisions of this Section shall not apply to sacramental wines, alcohol or liquors used for pharmaceutical or medicinal purposes or liquors used for filling the prescriptions of physicians.

"(8) Licenses granted upon any application made prior to July 1, 1937, for any new licenses, or for the renewal of existing licenses, shall be effective only to that date, and all licenses thereafter shall be issued for the fiscal year, ending December 31, but no license shall be issued for less than one-half year.

"Section 6.    Qualifications of Licensees.

"(A)  No Beverage Dispensary License or Retail License shall be issued to any person or association of persons who have not resided in the Territory for at least one year prior to the date of the application, or to any corporation which is not qualified to do business in the Territory.

"(B) No corporation, wholesaler, owner, officer, or representative of a brewery, winery, bottling works, or distillery shall be permitted to own any interest in any Beverage Dispensary or Retail Liquor Store, nor shall he or they be permitted to finance directly, or indirectly, any licenseholder in procuring quarters, or supplying equipment or furnishings in order to conduct such business.

"(C) Any distiller, brewer or wholesaler, whose plant or principal place of business is outside of the Territory but whose products are sold in the Territory, shall be required to obtain a Wholesale License for the sale of his products in the Territory, and a separate license shall be required for each wholesale distributing point within the Territory.  Any distiller, brewer or wholesaler, not resident in the Territory, selling intoxicating liquors in the Terri-

tory, shall, before soliciting any business in the Territory, designate a principal place of business, or headquarters, in the Territory, and appoint an agent upon whom service can be had, and shall also obtain a license under the provisions of this Act. This subdivision shall not apply to sales made to any regularly licensed wholesaler resident in the Territory.

"(D) No person or persons, other than the licensee, shall have any direct or indirect financial interest in the business for which the license is issued; that the licensee shall, wherever possible, superintend in person the management of the business for which the license is issued; but if any other person is employed to manage the same, he or she shall have all the qualifications of a licensee and the licensee shall be responsible for the proper conduct of the business.

\*　　\*　　\*　　\*　.　\*　　\*　　\*

"Section 13. Classification of Licenses. The following licenses may be obtained from the Clerk of the District Court:

"(A) Beverage Dispensary Licenses: A Beverage Dispensary license shall give to the holder thereof the right to sell or serve on the premises beer, wine and hard liquors for consumption on the premises only. Provided, however, that the premises for which such license is issued shall not be connected by doors or otherwise with premises covered by any other license issued under these regulations; and provided further, that the sales under Beverage Dispensary Licenses are limited to less than five wine gallons to any one person in any one day. A Beverage Dispensary License Fee shall be Five Hundred Dollars ($500.00) in all towns, villages, settlements and places of population not exceeding fifteen hundred persons and One Thousand Dollars ($1,-000.00) in all towns, villages and incorporated cities having the population in excess of fifteen hundred persons and all applicants desiring a Beverage Dispensary License, at the time of filing with the District Court, the applicant for such license shall also file a bond, either in cash or a surety

company bond, to be approved by the court, the condition of such bond or undertaking shall be, that the licensee or licensees are the sole owners and that no other persons are financially interested either directly or indirectly and will conduct said business in accordance with the existing laws pertaining to the manufacture and sale of intoxicating liquor in Alaska. Such bond shall be in the penal sum of Twenty-five Hundred Dollars ($2500.00). Upon conviction for violation of the laws of Alaska pertaining to the manufacture and sale of intoxicating liquor or upon revocation of a license, said bond shall be forfeited and covered into the Territorial Treasury.

"The Judge of the District Court for the Territory of Alaska is hereby empowered and authorized to revoke any license hereafter granted, as well as those now issued. Complaints for revocation of licenses under this Act shall be filed by the U. S. Attorney, his assistants or any Federal or any Territorial Enforcement Officer. Such complaints shall be filed with the Clerk of the U. S. District Court. Upon such complaint being filed, duly verified, the U. S. District Judge shall issue an order to show cause against the licensee and upon hearing the same, or upon default of the licensee, the said Judge shall issue his judgment and order in the matter.

"The holder of any license which has been revoked as herein provided shall not be entitled to apply for and receive another license under this Act for a period of five years from the date of the Order of Revocation.

"All employees serving intoxicating liquor in a Beverage Dispensary shall be male citizens of the United States, over the age of 21 years and of good moral character. Any such employe of such place violating the provisions of this Act shall be equally guilty with the holder of the license and shall be punished accordingly. The Treasurer of Alaska is empowered and directed with respect to existing licenses, to make any and all adjustments necessary by extending credit on new licenses or making refunds to the

licensees for the unused portion of the licenses heretofore issued at the option of the licensee.

"Provided that such beverage dispensary licensee shall be permitted to continue in operation during the period for which his present license is effective, if he shall so elect. Provided however such license shall not be extended to include intoxicating liquor other than beer or wine unless he first obtain a new license and post bond as provided hereinbefore.

"(B) Restaurant Licenses:  *  *  *  A Restaurant License Fee is One Hundred Fifty Dollars ($150.00).

"(C) Road Houses Licenses:  *  *  *  A Road House License Fee is Seventy-five Dollars ($75.00).

"(D) Club Licenses:  A Club License shall give to clubs, fraternal organizations, and patriotic organizations, that have a Territorial or National Charter, and which have been so incorporated for a period of two years or more, the right to sell intoxicating liquors to their members only in their club rooms. A Club License Fee is Two Hundred Dollars ($200.00). Clubs composed of members of the armed forces of the United States may be granted a license under the provisions of this Subsection irrespective of the date of their organization.

"(E) Bottling Works Licenses:  *  *  *  A Bottling Works License Fee is One Hundred Dollars ($100.00).

"(F) Brewery Licenses:  *  *  *  A Brewery License Fee is One Hundred Dollars ($100.00).

"(G) Retail Licenses:  *  *  *  A Retail License Fee is Three Hundred Dollars ($300.00).

"(H) Wholesale Licenses:

"(1)  *  *  *  A General Wholesale License Fee is Five Hundred Dollars ($500.00).

"(2)  *  *  *  A Wholesale Hard and Distilled Liquor License Fee is Five Hundred Dollars ($500.00).

"(3)  *  *  *  Malt Beverages and Wine License Fee is One Hundred Dollars ($100.00). A Wholesale License shall be required for each distributing point.

"(I) Distillery Licenses: * * * A Distillery License Fee is One Hundred Dollars ($100.00).

"(J) Importers Licenses: * * * An Importer (of malt beverages) License Fee is Five Hundred· Dollars ($500.00).

"(K) Boat Licenses: * * * A Boat License Fee is One Hundred Dollars ($100.00)."

The power exercised by the district court under the law, a part of which is above quoted, is judicial, and not administrative, in its nature. Clearly it was the intent of the legislature to make the proceeding a judicial one. In fact the legislature probably has no authority to impose administrative duties upon the district court or judge. This is indicated by the act approved August 29, 1914, 38 Stat. 710, Title 48, Sec. 91 U. S. Code, 48 U.S.C.A. § 91, which reads as follows: "91. Powers of courts and legislature. Nothing in this subchapter or in section 23 of this title shall be so construed as to prevent the courts of Alaska from enforcing within their respective jurisdictions all laws passed by the legislature within the power conferred upon it, the same as if such laws were passed by Congress, nor to prevent the legislature passing laws imposing additional duties, not inconsistent with the present duties of their respective offices, upon the governors, marshals, deputy marshals, clerks of the district courts, and United States commissioners acting as justices of the peace, judges of probate courts, recorders, and coroners, and providing the necessary expenses of performing such duties."

It will be observed that the law provides for two classes of licenses: one class within and the other without incorporated towns or cities. To justify the issuance of a license without an incorporated city it is necessary for the applicant to show to the court that a majority of the citizens over 21 years of age residing within two miles of the place where the license is to be issued has consented to the carrying on of the desired type of liquor business at that place. To secure a license within an incorporated city it is neces-

sary that the applicant shall make application in the district court but need not show that a majority of the citizens within two miles of the place of proposed business has given consent, and in lieu thereof it is necessary that the application embrace "a list of at least five references as to the integrity of the applicant and the desirability of the issuing of a license for the premises mentioned therein." Upon receipt of the application it is the duty of the clerk of court to notify the city council of the necessity for action on the application by the council and the filing with the clerk of a certificate showing the action taken. In practice, the application is actually sent to the city council. Failure of the city council to act upon any application subjects the city to the penalty of losing its right to refund of taxes. Under the law it is the duty of the court to set time for hearing on the application and at such hearing the court "shall consider the application and any protests that may be filed against the same, and shall also hear the applicant or others appearing in connection with the matter, and give its judgment, which shall be final, * * *."

It is notable that with respect to applications for places outside of incorporated cities no showing is required, in the application or otherwise, "as to the integrity of the applicant and the desirability of the issuing of a license for the premises mentioned." Apparently all that is necessary is such an application in compliance with law and the consent of a majority of the local residents. As to an application for use in an incorporated city, however, the prescribed procedure is, as above stated, by reference first to the city council. Nothing in the law indicates that the court is bound by the action of a city council, although the decision of the council is entitled to great respect and consideration. That the court must exercise lawful and sound, and not arbitrary, discretion in granting or refusing licenses is beyond question. Apparently it is within the power of the court to deny an application which has been approved by the council, and likewise within its power to approve an application which has been rejected by the council. It

may well be that all matters relating to the integrity of the applicant and the desirability of issuing the license are addressed to the discretion of the city council and not to that of the court. In that view, the court may not justly refuse to grant an application showing compliance with the law if the city council has approved the application, nor may the court grant an application which has been disapproved by the council upon grounds of lack of integrity or desirability though the application itself shows compliance with law, except, possibly, for arbitrary or capricious action by the council amounting to abuse of discretion. At any rate it is obvious that in all cases the provisions of law must control: that no application should be denied by the court which is in conformity with law and is approved by the city council, and no application should be granted by the court where it appears that although the application has been approved by the city council the application is not in conformity with law and it is obvious that the license cannot be availed of without continuous violation of law.

While not necessary to the decision in this case, and no opinion is expressed upon the question, the power of the legislature to make the decision of the district court final in this, or any other case of judicial cognizance, is open to question. Nowhere is the legislature of Alaska granted authority to prescribe the jurisdiction of the district court or the appellate jurisdiction of the United States Circuit Court of Appeals. In this connection it is to be noted that in the year 1938 Congress enlarged the jurisdiction of the Circuit Court of Appeals so as to grant applications from the District Court of Alaska "in all cases." The following is quoted from the act approved June 20, 1938, 52 Stat. 779, Title 28, Sec. 225 U.S.Code, 28 U.S.C.A. § 225:

"(a) The circuit courts of appeal shall have appellate jurisdiction to review by appeal final decisions— * * *.

"Third. In the District Court for the District of Alaska, or any division thereof, * * * in all cases."

It will be observed that this act of Congress was passed subsequent to the enactment of section 3 of chapter 78 of

the Session Laws of Alaska 1937, which says that the judgment of the district court upon liquor applications "shall be final."

The club is an association largely composed of industrial workers and their friends and associates. The following, quoted from the articles of incorporation, indicates the nature of the association: "The object and purposes for which the corporation is formed are to provide an organization restricted to persons engaged in earning a livelihood through labor and services, wherein the members may be associated together for social, benevolent, educational, and fraternal purposes, and to secure for the individual members, and the membership as a whole, such benefits as they may be lawfully entitled to, and retain, obtain, and maintain such protective measures as may be rightfully and lawfully required, to improve working conditions, and to bargain collectively with employers."

The Territorial Legislature, as is evident from the sections of law quoted above, has made special provision for clubs. In Chapter 78 of the Laws of 1937 provision was made for the issuance of club licenses to clubs, fraternal organizations and patriotic organizations "that have a Territorial or National Charter, and which have been so *incorporated* for a period of two years, the right to *serve* beer and wine to the members and their guests in their club rooms." (Italics inserted.) But in 1939, by the provisions of Chapter 76 of the Session Laws for that year, the provisions of law concerning club licenses were amended to read as above. The changes are: (a) omission of any reference to incorporation, and (b) the granting of the right to "sell" intoxicating liquors "to their members only" instead of authority to "serve * * * members and their guests" in their club rooms. It is clear that the legislature considered such disposal of liquor as sales, and limited such sales to the members of the club, although there is nothing in the law forbidding the serving of liquor to guests.

Doubtless by reason of the nature of a club and its necessarily limited membership, a club license under existing law requires payment of a fee of $200 while a beverage dispensary license, premitting sale of all types of liquor to the public except in original packages or in bulk, requires payment of a fee of from $500 to $1,000. The financial advantages, in one aspect, of having a club license rather than a general beverage dispensary license are obvious.

Counsel for the applicant urge that the protest should be overruled for several reasons: first, that the application has already been approved by the city council, which is the only body having discretion to refuse approval of a license so long as the applicant has conformed with the provisions of the law required to be set forth in his application, and that the application itself is in proper form; second, that the applicant is a club and as such does not come within the provisions of subsection 6(D) of the act of 1937 providing that "no person or persons, other than the licensee, shall have any direct or indirect financial interest in the business for which the license is issued;" third, that under any consideration of the facts or the law it cannot be said that there is any "business" at the present time because the license is now being applied for and the former license for sale of liquor on the premises of the club expired on December 31, 1944; fourth, that the sale of liquor by the club to its members as permitted by law under a club license is not a "business" as contemplated by subsection 6(D); fifth, that the inhibition contained in subsection 6(D) is not embraced directly or indirectly in the requirements as to the contents of an application for a license. set out in section 4; sixth, that subsection 6(D) itself nowhere authorizes or even suggests that a license should be *refused* upon the grounds stated therein and that if the legislature had intended to give the court power to refuse the license upon grounds involving any violation of subsection 6(D) language would have been used to that effect similar to the language of subsection 5(3); seventh, that the allegations of the protest respecting closing hours, inspection and

financial interest in the business (if it be a business) of another than the club itself are not supported by the evidence.

■ The evidence given at the hearing disclosed that persons other than members of the club had been served with liquor on the club's premises, but there was no testimony that any of the non-club members so served paid for the liquor consumed. The only proper presumption in which the court can indulge is that the liquor so served was sold to and paid for by members of the club and, therefore, the sales were lawful. Admittedly, a part of the club premises is used as a public dining room open to all and not limited to members of the club and their guests. At the same time the testimony showed that club members, and probably their guests, were served with liquor in this dining room. While the use of a part of the club premises for a public dining room may be in some degree inconsistent with its restricted and private use as such part of the club premises, nothing in the law forbids such duplicate use, since the room mentioned is considered a part of the club premises, and is truly so in some respects at least. There is no legal reason why members of the club should not purchase and be served with intoxicating liquor in that room under the club license, although persons not members of the club and not beneficiaries of the bounty of the members of the club may not lawfully purchase any liquor there. If the legislature had intended to prevent the existence of any such condition, adequate provision would doubtless have been made in the law.

The propriety of requiring the application to embrace any statement to the effect that no person other than the applicant has or will have any financial interest in the business to be established or continued under the application is seriously contested because the provisions of the act, as above indicated, contain no such specific requirement. It is pointed out that although the form of the application prescribed in section 4 contains nothing concerning the lo-

cation of the place of business as respects any school building or church, in subsection 3 (of section 5) we find a provision that no license shall be issued for the sale of any intoxicating liquor in any building within 200 feet of any school building or church.

It is suggested that if the legislature had intended the application to negative interest in the business by another than the applicant, language would have been used similar to that of subsection 5(3) above mentioned. The answer to that is that subsection D of section 6 is the substantial equivalent, with respect to subject matter, to subsection 5 (3) because the subject matter of subsection 6(D) does not readily lend itself to the phrase "no license shall be issued." Moreover, it would be little less than frivolous for the court to grant an application in a case where it is apparent that the application cannot be availed of without continuous daily violation of that part of the law contained in subsection 6(D). The further answer is that the present application forms, which contain a paragraph negativing ownership of other than the applicant, were prepared by a former judge of this court, Honorable Simon Hellenthal, shortly after the act went into effect, and the application has been used without known protest during all of the intervening years. This conduct substantially amounts to what Judge Beatty, in a concurring opinion in the Cuzner case hereinafter cited, referred to as contemporaneous construction of the law.

In the consideration of similar issues arising under other statutes, courts have differed widely. Some have held that the distribution of intoxicating liquor by a club to its members, or even the disposition thereof by the ordinary methods of sale and purchase, are not "sales" within the intent and meaning of statutes requiring licenses for sale of intoxicating liquors. Courts have likewise similarly denied that such transactions on the part of clubs constitute a "business" or "doing business." Other courts of equal rank have arrived at diametrically opposite conclusions. There is no possible way of reconciling such conflicting decisions.

As will be hereinafter indicated, our own Circuit Court of Appeals is in harmony with the reasoning expressed in the opinions of those courts which hold that the sale or disposition of liquor by a club to its members was a sale and a business within contemplation of an early Alaska statute now repealed. In the two Montana cases mentioned below the question under consideration was the effect of a Montana statute which empowered, authorized and *directed* the administrative board of that state to issue liquor licenses to qualified applicants, cited here as bearing upon the authority of the district court to deny any application which has been approved by the city council. The divergence in judicial opinion on the question is aptly stated in 30 Am.Jur., Secs. 283 and 309 and in 15 R.C.L. page 353 et seq. cited by counsel during the argument. Below is listed a number of the adjudicated cases similarly referred to during argument as persuasive, if not authoritative: Cuzner v. California Club, 1909, 155 Cal. 303, 100 P. 868, 20 L.R.A., N.S., 1095; Nevada v. University Club, 1913, 35 Nev. 475, 130 P. 468, 44 L.R.A., N.S., 1026; State of Louisiana v. Boston Club, 45 La.Ann. 585, 12 So. 895, 20 L.R.A. 185; Tennessee Club v. Dwyer, 11 Lea 452, Tenn., 47 Am.Rep. 298; In re Mark, 1934, 115 Pa.Super. 256, 176 A. 254; Reichelderfer v. Johnson, 1934, 72 F.2d 552, 63 App.D.C. 334; McCarten v. Sanderson, 1941, 111 Mont. 407, 109 P.2d 1108, 132 A.L.R. 1229; McFatridge v. District Court, 1942, 113 Mont. 81, 122 P.2d 834; Baker v. Fenley, 233 Mo.App. 998, 128 S.W.2d 295; People v. Andrews, 1889, 115 N.Y. 427, 22 N.E. 358, 6 L.R.A. 128; People v. Soule, 1889, 74 Mich. 250, 41 N.W. 908, 2 L.R.A. 494; State v. Essex Club, 1890, 53 N.J.L. 99, 20 A. 769.

In the case of Mustard v. Elwood which originated in Alaska and was decided by the Circuit Court of Appeals for the Ninth Circuit, reported in 223 F. 225, 4 Alaska Fed. 307, the issue was whether a social club called the "Eni" or "Log Cabin Club," of Nome, Alaska, was required to secure a retail or barroom license for sale of liquor to its members. Clubs were not even mentioned in the law which

provided "a retail or barroom license shall be required for every hotel, tavern, boat, barroom, or other place in which intoxicating liquors are sold by retail." .Carter's Penal Code, § 468. By a divided court, Judge Ross dissenting, it was held that the club must procure the license prescribed by law. While the pre-prohibition law of Alaska concerning the sale of intoxicating liquors differs considerably from the Alaska law in force at the present time, in some respects the two enactments are similar and, therefore, the declaration of the Circuit Court of Appeals from the Ninth Circuit, as to the status of the sale of liquor in clubs, is still relevant and still measurably controls.

Argument has been made to the effect that both subsections (B) and (D) of section 6 are designed to prevent ownership of retail establishments by manufacturers, and the attention of the court has been invited to the language used in the opinions in the cases of Mark and Reichelderfer above cited. In the Mark case the declaration of the court, so far as it involves the issue before us, is obiter dicta, and in the Reichelderfer case the issue was whether a stockholder and officer of a brewery corporation might lawfully own the premises occupied by a retail establishment.

Nothing in the proof and nothing within the bounds of common knowledge as to the sale or disposal of intoxicating liquor in Alaska indicates in the slightest degree that subsection (D) of section 6 of our law is intended to prevent liquor manufacturers from operating retail establishments. No showing has ever been made and the court has no knowledge of any kind that the evil, if it be an evil, of brewery ownership of saloons has ever affected Alaska.

It is vigorously urged that although the legislature has the constitutional authority to control sales of liquor, whether by clubs or otherwise, and that under our present law the legislature has legitimately exercised that power with respect to clubs, and although the sale of liquor by an incorporated club to its members is a sale within the con-

templation of the law, yet by reason of the nature and organization of the club in question, and all similar clubs, the sale of liquor by a club to its members is not a "business" as contemplated in subsection 6(D), or otherwise. There is no evidence that the legislature used the word "business" in any technical or abstruse way. The ordinary definition of the word "business" would apply in this case, as in every other. Among the definitions given of "business" in Webster's International Dictionary, are the following: "That which busies or engages time, attention or labor as a principal serious concern or interest; any particular occupation or employment habitually engaged in especially for livelihood or gain; mercantile transactions; buying and selling." One of the elements of business as we all understand it is that it is ordinarily carried on for profit. If the profit motive exists in the transaction where goods, wares and merchandise are bought and sold, and that buying and selling is continuous from day to day and week to week and month to month, and the profit is consistently and steadily taken by the person carrying on the transaction—by the seller— then it is difficult to escape the conviction that such transactions are truly of business within any ordinary meaning of the law, and that it is necessary to stretch or strain the law to hold that the transaction is not a business. Such an operation is truly a business just the same as the sale of liquor to the public by the holder of a beverage dispensary license is a business, and the only distinction is that as respects the club, the patronage is limited to the members instead of being open to all the qualified people in the community. There is in reality no other substantial difference whatever. The holder of a beverage dispensary license may sell to everybody, but the holder of a club license, namely, the club itself, may sell only to its members. Both are in business for profit. Both employ people to work for them and pay them compensation for such labor. Every element of sale present in one case is present in the other. No suggestion was made during the hearing that the sales in the club were made at cost and without any profit to the

Club—in fact it is reasonably obvious that the business conducted by the club of selling liquor to its members is one of the chief sources of profit to the club. There is nothing wrong or illegal or immoral about this, but the transaction or series of transactions involved in the sale of liquor is a business just the same.

In subsection (D) of section 6 the law forbids any person other than the licensee to have any direct or indirect financial interest in the business *for which the license is issued.* It is argued that the legislature could not have meant to include clubs within that inhibition because clubs are so different in their nature and organization and purposes from the ordinary liquor-selling establishments, and special reference is made to beverage dispensaries. However, from section 13 of the act, we find that a great variety of licenses are authorized to be issued not only to beverage dispensaries but also to numerous other classes including restaurants, road houses, bottling works, breweries, retail package establishments, wholesalers of liquor in three categories, distilleries, importers, and boats. Each of these classes has a different type of license and the license fees widely vary. An importer must pay $500 for his license, so must one class of wholesalers. The holder of a retail license must pay $300; road houses $75; restaurants $150 and beverage dispensaries $500 or $1,000. Counsel for the applicant have also argued that under the law a bond containing declaration that no other person than the applicant has any interest in the business is required only of those holding beverage dispensary licenses and, therefore, it was not designed that clubs should be included within the provisions of subsection (D) of section 6; but this argument omits consideration of the fact that there are in all 13 different kinds of licenses which may be issued under authority of law, while a bond is required of those holding beverage dispensary licenses only. It cannot be reasonably concluded that subsection (D) was meant by the legislature to apply to beverage dispensaries only and not to the holders of other classes of licenses. The law says that no person or persons

other than the licensee shall have any direct or indirect financial interest in the business for which the license was issued, no matter whether that is a restaurant business or a wholesale business, or a retail business, or an importer's business, or a distillery business, a brewery business, a restaurant business, or the business of a club in selling liquors to its members for profit. If the legislature had intended to exclude clubs from the requirements of subsection (D) of section 6 doubtless we would now have in the law a suitable provision to accomplish that intent. Therefore, the decision now made is that the provisions of subsection (D) apply to clubs as well as to all other persons who may have or apply for any of the numerous types of licenses authorized to be issued by law.

The really serious question in the case revolves around the relations of Z. E. Eagleston to the club. While oral testimony was received, those relations as they exist at present are said to be embodied fully in a contract made between the club and Eagleston on August 1, 1944, and embracing more than 12 pages of typewritten matter. Under the provisions of this agreement Eagleston is not only a member of the executive committee of the club, consisting of the president, secretary and treasurer, he being the treasurer, but is also a trustee for the club and is described in the agreement itself as trustee of an expressed trust. Eagleston testified that he took the lease on the premises at the request of the club and for its accommodation, with the understanding that the premises would be available for use by the club and that the lease was taken in his name rather than that of the club upon the demand of the then owner, E. R. Tarwater, now deceased; that he spent a considerable amount of his own money in order to make the premises more suitable for the use of the club. The written agreement does not definitely fix the salary or compensation of Eagleston, but in his oral testimony he stated that it was approximately $6,000 per year. The club pays no rent as such. Under the agreement Eagleston is manager of the property and of its operations, and although the sale of

liquor to members is not mentioned in that agreement, the evidence clearly indicates that Eagleston manages all such activities. The agreement provides that the funds of the club shall be deposited in four accounts or funds: the Headquarters fund, containing membership fees and dues from subordinate clubs or lodges; the Membership fund, containing the dues paid by members of the club, which is called in the agreement Local Chapter Number One, arbitrarily fixed for the year 1944 at the sum of $1,500, also contains rentals received for use of the premises as meeting rooms by unions or other organizations; the General fund which evidently, although not explicitly, is the depositary for all money received from the sale of intoxicating liquors, and from operation of the public dining room, although another part of the agreement expressly provides that as respects the food supply Eagleston "shall be entitled to the revenues entire including profits, if any." The remaining fund is called the Club fund, but apparently money can come into the Club fund only through the General fund, and unless agreeable to all no more than $1,200 per year may be put into the Club fund. Once money gets into the Club fund it is under the control of the club, as distinguished from the control of the trustee. A significant part of this agreement is to be found on page 11 wherein provision is made that in the event of termination of the relations created by the agreement any assets remaining shall be divided and distributed 25% to the club and 75% to the trustee.

The agreement also requires the trustee to advance moneys for burial and death benefits, charity, church funds, strike funds or civic betterment funds, but limiting the amount that may be so demanded in any one quarter to $500, to be reimbursed from the Membership fund. The agreement indicates that the trustee will furnish the capital necessary for the liquor stock required, and that due to market conditions "liquor for the bar should be purchased whenever available and in as large amounts as may be available and practical." Eagleston is required by the

agreement "to pay the costs and expenses of operations out of funds out of his own moneys and/or moneys received through operations of the business, subject however, to accounting and adjustment as provided in this agreement, directions of the Executive Committee, his trust, law and equity."

In the agreement the club reserves the right to direct the operations of management through the executive committee, to terminate the agreement and remove the trustee from office for certain reasons and under certain conditions, to require a report and accounting from the trustee from time to time, to determine who may or may not be eligible to admittance to the premises, to employment, and to the use of the facilities, and require "that the trustee pay all current accounts promptly and permit no obligations to accrue against the club of any kind or nature whatsoever."

The fact that the sales of liquor by the Alta Club to its members constitute a business is at least suggested by one paragraph of the agreement between the club and Eagleston dated August 1, 1944, found near the bottom of page 4, subdivision (b) which reads as follows: "To pay the costs and expenses of operations out of funds out of his own moneys and/or moneys received through operations of the business, subject however, to accounting and adjustment as provided in this agreement, directions of the Executive Committee, his trust, law and equity."

The volume of that business as derived from the sale of liquor, is further suggested in the following quoted paragraph of the agreement taken from page 8 under the heading "Distribution Prior to Termination" as follows:

"The Executive Committee may, from time to time, as the need therefor arises and the circumstances permit, declare a dividend to the Club and to the Trustee out of the General Fund (which consists of revenues other than membership or restaurant) in manner and amount in the discretion of the Executive Committee, but substantially, however, in a manner as follows:

"(a) In cash to the Club Fund in part or whole; or

"(b) Some part thereof may be paid into the Club Fund by cash deposit the balance of said sum declared to an off-set in a like amount on the obligations to the Trustee, or the whole thereof to apply as an off-set."

It is reasonably plain that the revenues described in the above-quoted paragraphs from the agreement are derived wholly from sales of liquor.

Under all of the oral testimony and the provisions of the agreement mentioned the business affairs of the club, including the purchase and keeping and sale to members of liquor, are so inextricably intermingled with those of Eagleston that it is difficult to say where one begins and the other leaves off. The conclusion is irresistible that Eagleston has an interest in the business for which the license in this proceeding is sought, and, therefore, the license may not under present conditions be lawfully issued.

The other objections presented are of little if any consequence. Even if it be admitted that the club on one occasion violated an ordinance of the City of Anchorage with respect to the closing of places selling intoxicating liquor, and on another occasion refused admission to the police officers of Anchorage to the premises of the club at 2 o'clock in the morning, such acts would not warrant refusal of a license. After all, it is the duty of the city authorities to enforce the city ordinances and it may again be noted that the city council has definitely approved the present application. Evidently the transgressions, if any, of the club on the occasions as to which testimony was given were not considered sufficiently serious to warrant the council in refusing approval of the new application.

Nor is the testimony concerning the possible effect of a forfeiture clause in the lease of any material weight. That is a matter for determination between the owner of the property and Eagleston. It may be that even if the forfeiture provision of the lease is violated, no forfeiture will

ever be invoked by the owner. It is possible that there is no ground for forfeiture. Testimony on the subject here is all but irrelevant.

While the application must be denied at the present time, it is evident from the proof that both parties are well satisfied with present arrangements. No evidence has been offered tending to show overreaching or profiteering on the part of Eagleston. In fact it is indisputable that he has furnished most of the cash used in maintaining the club. Although the application must be denied at this time, permission will be granted in the present proceeding to the club to renew the application when supported by sufficient showing that no person other than the applicant has or will have any interest in the business for which the license is sought.